# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

RAMONA ERAZO,                *

                         *

        Plaintiff,        *

                         *

v.                         *     Civil No. PJM 05-586 (Lead Case)

                         *     Civil No. PJM 05-587

MICHAEL O. LEAVITT, SECRETARY,   *     Civil No. PJM 05-588

DEPARTMENT OF HEALTH AND     *

HUMAN SERVICES, *et. al.*         *

                         *

        Defendants.      *

# <u>OPINION</u>

Plaintiff Ramona Erazo has filed three *pro se* Complaints[1] against her former employer, Michael O. Leavitt, Secretary of the Department of Health and Human Services (HHS)[2] pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et. seq.* ("Title VII").  She alleges failure to promote based on national origin; constructive discharge; hostile work environment; retaliation, and other various acts of discrimination including denial of training and criticism on performance evaluations.  The matter is before the Court on Leavitt's unopposed

---

[1]      The Court has granted Defendant's Motion to Consolidate the and will deal with the three complaints in this one Opinion.

[2]      Erazo originally named Tommy G. Thompson as Secretary of HHS.  Thompson is no longer Secretary.  Pursuant to Federal Rule of Civil Procedure 25(d), Leavitt, the current Secretary, is automatically substituted as Defendant herein.  The Court ORDERS the Court Clerk to enter this substitution of parties.

Motion to Dismiss or, in the Alternative, for Summary Judgment.[3] The Court has determined that because the Secretary has cited evidence outside the four corners of the Complaint, his Motion should be treated as a Motion for Summary Judgment. *See* Fed. R. Civ. P. 12(b). No hearing is necessary to dispose of this matter. *See* Local R. 105.6 (D. Md. 1999). Having considered the motions, the Court will GRANT Defendant's Motion for Summary Judgment.[4]

I.

Erazo alleges *inter alia* that HHS discriminated against her based on her national origin (Honduran-American) and prior activity with the Equal Employment Opportunity Commission (EEO) when it supposedly denied her request for training, denied her request to be promoted to the GS-7 level, and criticized her work on her performance evaluation. She also claims she was the victim of retaliatory harassment, which she suggests created a hostile work environment and, along with the discrimination that she endured, led to her forced retirement.

The relevant facts are these:

Erazo was a Grants Clerk in Unit II of the Review and Control Group of the Project Control Section of the Division of Receipt and Referral of the Center for Scientific Review at the National Institutes of Health in Bethesda, Maryland, a part of HHS.. She joined the Project Control Section in 1980 and reached the GS-6 grade level in 1986. She retired from that department in 2004.

---

[3]
    Leavitt filed his Motion to Dismiss or, in the Alternative, for Summary Judgment on September 6, 2005. The Clerk's Office sent Erazo a Rule 12/56 letter on September 8, 2005, advising her that a potentially dispositive motion had been filed in the case and that she needed to respond to it in timely fashion. Her opposition was due by September 23, 2005. On September 29, 2005, the Court received from her a Motion for Extension of Time to File Response. On October 21, 2005, the Court granted Erazo until January 20, 2006 to respond to the Motion. No further response has been received from Erazo since that time. Accordingly, the Court proceeds to decide the motion.

[4]
    Leavitt's Motion to Dismiss is MOOT.

In August 1999, the Division began to investigate the possibility of contracting out all the work in the Project Control Section, except for three supervisory positions.  On April 11, 2000, Dr. Suzanne Fisher, Director of the Division of Receipt and Referral met with the Project Control staff and announced the staffing change.  As a result of the reorganization, she emphasized to the staff that the Department would attempt to place the existing civil service employees of Project Control into other positions.  Affected employees were informed of opportunities for training and details to other units.

Erazo's supervisor at the time was John Diggs, Chief of Project Control and Application Receipt, who in January 2000 was designated as Chief of the Division.

Erazo alleges that on several occasions in 1999 and 2000, she asked Diggs about the possibility of a promotion to the GS-7 level to the position of Grants Technical Assistant.  Diggs allegedly told her that she lacked the background for that promotion and would need more training.  Erazo supposedly requested the opportunity to receive that training but Diggs denied the request.  In May 2001, however, a white female co-worker, received the necessary training and was promoted to the position and grade level that Erazo aspired to.  Shortly thereafter, Erazo discussed her concerns with the EEO Manager, Margarite Curtis-Farrell, and an investigation was initiated.  Erazo filed her first EEO complaint on July 31, 2001.

On September 23, 2001, Erazo was reassigned to the Molecular, Cellular and Developmental Neurosciences, Integrated Review Group, as a GS-6 Grants Clerk, with the title of Grants Technical Assistant (GTA) trainee.  Dr. Carol Jelsema was the Chief of that section.  Roughly a year after joining the section, in September of 2002, Erazo traveled to New Orleans on eleven days of pre-approved leave.  While she was away, without approval, she extended her leave

to twenty-six days.  After her return, in October 2002, she sought a promotion to a GS-7 level Grants Technical Assistant from Jelsema.  Recognizing that she required additional training to qualify for the promotion, Erazo requested a formal training plan with the ultimate goal of achieving a promotion to the GS-7 level.   Jelsema provided Erazo with a training plan, but Erazo claims that the training was conducted in a fast-paced mode that prevented her from developing the requisite skills.  In addition, Jelsema allegedly forbade her from seeking informal training outside her formal training plan.  Erazo claims that Jelsema  frustrated her promotional aspirations in retaliation for Erazo's filing of her first EEO complaint prior to joining the Molecular, Cellular and Developmental Neurosciences, Integrated Review Group.  Erazo subsequently filed a second EEO complaint on January 21, 2003, claiming that  Jelsema's actions were retaliatory.

On November 14, 2002,  Jelsema  rated Erazo's performance on her mid-year Progress Review as "acceptable," and indicated areas where Erazo needed to improve her performance.  Again, Erazo claims that  Jelsema's criticisms were included in the report in retaliation for Erazo's EEO complaint.  She further alleges that around this same time,  Jelsema and Deborah Welty, Lead Grants Technical Assistant, began to treat her with hostility, speaking to her in "harsh" tones, in further retaliation against her for the EEO complaint.

In April 2003, Erazo's work unit moved from the fifth floor to the fourth floor of the same building.   According to Erazo, in connection with the move, Jelsema announced seating arrangements for the unit on the new floor that would have isolated Erazo from the rest of the group, an action that Erazo claims was motivated by both animus based on her national origin as well as retaliation for her EEO complaint against  Jelsema.  When Erazo protested the seating assignment, an assignment was found for her near to the rest of the unit.

- 4 -

On January 9, 2004,  Jelsema sent Erazo an email chastising her for having been away from her desk for more than an hour at lunchtime the day before.  Erazo says that the email "triggered an attack of anxiety and depression."  On January 12, she visited a doctor, who diagnosed her as having high blood pressure.  On January 13 and 14, she took two approved days of sick leave, and from January 15, 2004, through March 15, 2004, she remained absent from work without prior approval.  As a result of this, she was placed on AWOL status.  Erazo called her supervisor sporadically during this time and left voicemail messages after business hours informing the supervisor that she was sick and unable to work.  However, during her absence from work, from February 17, 2004, until March 18, 2004, she traveled to Louisiana.

On March 15, 2004, Erazo's supervisor sent her a Proposal to Remove her from her employment on account of her absence without leave, failure to properly request leave, and failure to follow supervisory instructions.  After Erazo was given the opportunity to respond, David Witmer, Executive Officer, ruled on the proposal, finding sufficient evidence justifying Erazo's removal from her position.  Before making his decision final, Erazo was given the opportunity to request early retirement.  She declined the invitation repeatedly.  Only after receiving official notice of her removal did Erazo apply for early retirement.  That application was accepted and HHS agreed to let her retire before her removal would become effective.

## II.

A party is entitled to summary judgment if the evidence in the record "show[s] that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  While the evidence of the non-movant is to be believed and all justifiable inferences drawn in her favor, such inferences must "fall within the range of

reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). Summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted). Trial judges have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323-324). A court should enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Where the plaintiff fails to meet this burden, the defendant should not be required to undergo "the considerable expense of preparing for and participating in a trial." *Hayes v. Hambruch*, 841 F. Supp. 706, 709 (D. Md. 1994) (Harvey, J.), *aff'd,* 64 F.3d 657 (4th Cir. 1995).

Even though intent is important in employment discrimination cases, the statutory purpose of summary judgment applies in no lesser degree to these types of cases than to commercial or other areas of litigation. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). In the employment discrimination context, a subjective, even if genuine, belief of discrimination will not shield a non-moving plaintiff from a grant of summary judgment. *See Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988).

III.

To prove disparate treatment under Title VII, the plaintiff has the burden of establishing discriminatory intent.  This can be met either by presenting direct evidence of discriminatory animus, or through utilization of the indirect burden-shifting proof scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Since Erazo has offered no direct evidence of discriminatory animus, this case is properly analyzed under the three-part *McDonnell Douglas* framework.

Under *McDonnell Douglas*, to create an inference of discrimination, the plaintiff must first establish a *prima facie* case of discrimination.  *Id*.  The central focus of the inquiry is whether the employer has treated "some people less favorably than others because of their race, color, religion, sex or national origin."  *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (quoting *Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

If the plaintiff establishes a *prima facie* case, a presumption of discrimination arises, which the employer may rebut by articulating a legitimate non-discriminatory reason for its employment decision.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The employer's burden is merely one of production, not persuasion.  *Id*. at 255-256.  If the employer meets this burden, the presumption raised by the plaintiff's *prima facie* case is rebutted and the factual inquiry proceeds to a "new level of specificity."  *Id*. at 255.

At that juncture, the plaintiff would have to prove that "the legitimate reasons offered by the agency were not its true reasons, but were a pretext for discrimination."  *Id*. at 253; *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989).  In proving pretext, the plaintiff would have to show not only that the employer's proffered reason was false, but that discrimination was the real reason for the employer's action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-

508 (1993).  The ultimate burden of showing that the employer intentionally discriminated against

her remains at all times with the plaintiff.  *Burdine*, 450 U.S. at 253.   Even if the plaintiff

demonstrates a *prima facie* case and sufficient pretext, however, the defendant will still be entitled

to judgment as a matter of law if "no rational factfinder could conclude that the action was

discriminatory."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also*

*Gillins v. Berkeley Elec. Coop., Inc.*, 148 F.3d 413, 416-17 (4th Cir. 1998) (explaining that the

plaintiff must develop some evidence on which a juror could reasonably base a finding that

discrimination motivated the challenged employment action).

## IV.

Erazo claims that she suffered several adverse employment actions as a result of

discrimination based on her national origin, including denial of training, adverse seating location,

and forced retirement.  The Court disagrees.  She has failed to establish a *prima facie* case that any

of these actions were motivated by discrimination.

## A.

> To establish a prima facie case of discriminatory denial of training, a plaintiff must
> show that: (1) the plaintiff is a member of a protected class; (2) the defendant
> provided training to its employees; (3) the plaintiff was eligible for the training; and
> the plaintiff was not provided training under circumstances giving rise to an
> inference of discrimination.

*Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002).  Erazo claims that she

asked her superior  Jelsema to provide her with the necessary training to achieve a promotion  to a

GS-7 level Grants Technical Assistant.  She concedes in two of her three Complaints, however, that

she received the requested training.  Erazo also protests that the training proceeded at an excessively

fast-pace and that  Jelsema prohibited her from seeking informal training from her co-workers.  Her

dissatisfaction with the training, notwithstanding, Erazo does not establish that she "was not provided training under circumstances giving rise to an inference of discrimination." *Id*. She received training, and even if that training was deficient, she offers no facts giving rise to an inference that the deficiency was motivated by discrimination against her as an Honduran-American.

## B.

Erazo's allegation that she was seated away from the other members of her work unit is similarly contradicted by her pleadings. Her Complaint states that her supervisor, Jelsema, originally planned to seat her away from her work unit, but after Erazo protested the plan, "Dr. Jelsema found a space for Plaintiff's [sic] that was in proximity to the work unit." In any case, even if Jelsema *had* seated Erazo in an isolated location, an undesirable seating location is not an adverse employment action under Title VII. *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892 (1981) ( "Disparate treatment theory . . . has consistently focused on the question of whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensation."); *Ward v. Johns Hopkins Univ.*, 861 F. Supp. 367, 377 (D. Md. 1994) (An assignment to the "dirtier" part of the basement does not amount to an adverse employment action as a matter of law.).

## C.

Erazo also fails to establish a *prima facie* case that she was forced into retirement because she is Honduran-American. Under the *McDonnell Douglas* framework, Erazo must show (1) that she belongs to a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's

legitimate job expectations; and (4) that the position remained open to or was filled by a similarly qualified applicant outside the protected class. *See Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 607 (4th Cir. 1999); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Despite the Certificate of Excellence that she received in 2002 and Erazo's references to herself as an "excellent employee," any attempt to suggest that she was performing at a level that met her employer's legitimate job expectations runs squarely into the fact of her unexcused, two month absence in 2004 just prior to her purported forced retirement. Even if the Court were to accept Erazo's claim that she met NIH's legitimate job expectations, Erazo does not say whether her position remained open to or was filled by a similarly qualified non-Honduran-American applicant. Her discriminatory forced retirement claim is without merit.

## V.

Erazo's constructive discharge and hostile work environment claims are likewise meritless. To prove constructive discharge, a plaintiff must at the outset show that her employer "deliberately made her working conditions intolerable in an effort to induce her to quit." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001) (internal quotation marks omitted). Plaintiff must therefore demonstrate: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186-87 (4th Cir. 2004); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997). Whether an employment environment is intolerable is determined from the objective perspective of a reasonable person. *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). "However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."

*James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (internal quotation marks and alterations omitted).

Erazo recounts receiving "scorning" emails and being spoken to in a "harsh and loud tone of voice" as well as a "loud and scorning voice."  Such commonplace examples of incivility comprise the extent of her allegations.  Unpleasant as they may be, these simply do not amount to working conditions so intolerable as to induce a reasonable person to retire.  Nor does Erazo provide any reason to believe that these supposed irritants were deliberately designed to induce her to retire.

To state a claim for hostile work environment, Erazo must show that: (1) the harassment was unwelcome; (2) the harassment was based on her national origin; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.  *See, e.g.*, *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).  Erazo's vague description of harsh words and attitudes does not describe sufficiently severe or pervasive harassment.  *Ocheltree v. Scollon Prods.*, 308 F.3d 351, 359 (4th Cir. 2002) ("The workplace that is actionable is the one that is hellish.").  Even if she had painted a picture of a hellish workplace – which she does not – she raises no material issue of fact that the alleged harassment was the result of her status as an Honduran-American.  Her hostile work environment claim is baseless.

## VI.

Erazo's retaliation claims are of a piece with her discrimination claims.  She submits that she was denied training, given negative comments on her mid-year Progress Review, seated away from her work unit, subjected to harsh treatment, and forced into retirement, all in retaliation for her two EEO complaints (or else both in retaliation for her complaints and because of

discrimination against her).[5]   In every respect, Erazo fails to establish a *prima facie* case of

retaliation.             "In order to establish a prima facie case of retaliation, a plaintiff must prove

three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse

employment action against her; and (3) that there was a causal link between the two events." *EEOC

v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005).  In none of Erazo's three Complaints

consolidated in this action does she offer any reason to believe that any of the complained of activity

flowed from her EEO complaints.  Instead, Erazo relies on assertions, such as, "The Complaint

alleges that the negative comments she received from her supervisor in [her mid-year Progress

Review] were as a direct result of her efforts to negotiate with the Agency a solution proposed by

the Administrative Judge for a prior EEO complaint . . . ."  Saying something is retaliation does not

make it so.

         While Erazo emphasizes that the activity she complains of occurred around the same

time that her EEO complaints proceeded through administrative review, this Court cannot infer a

causal connection from the mere fact that the complained of activity followed Erazo's protected

activity.  *See Olivares v. NASA*, 934 F. Supp. 698, 705 (D. Md. 1996) (to infer a causal connection

---

        [5]

        With the exception of being forced into retirement and,
possibly, of being denied training, none of the harms Erazo
supposedly suffered as a result of HHS's retaliation is of the
type proscribed by Title VII's anti-retaliation provision.
*Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2409 (2006) ("[T]he employer's
actions must be harmful to the point that they could well dissuade a reasonable worker from
making or supporting a charge of discrimination.).  Scorning emails, negative comments on
reviews, and poor seating assignments should not dissuade a reasonable worker from making a
charge of discrimination.  In any case, even if they could so dissuade and were prohibited acts
under Title VII, Erazo fails to establish a *prima facie* case that any of the acts were retaliatory, as
is described in the body of this Opinion.

merely from the fact that certain events follow an EEO complaint falls into "the classic post hoc ergo propter hoc fallacy"). The Court concludes as a matter of law that no causal connection can be inferred between Erazo's EEO activity and any of the alleged adverse employment actions, especially her alleged forced "retirement," in view of the fact that Erazo was absent from her job without approval once for two weeks and a second time for two months.

VII.

For all these reasons, the Secretary's Motion for Summary Judgment will be GRANTED. [6]

A separate Order will ISSUE.


_____/s/_____

**PETER J. MESSITTE**

**September 26, 2006**                    **UNITED STATES DISTRICT JUDGE**

---

[6]       The Secretary's Motion to Dismiss is therefore MOOT.